SCOLLAY
v.
DUNN.

Rec. 1763.
Fol. 107.

An Hoſ-
tage ſent by
the Maſter
for the Ran-
ſom of a Ship
taken by the
Enemy can-
not maintain
Admiralty
Proceſs *in
Perſonam*
againſt the
Owners for
refuſing to pay
the Money
for his Libera-
tion. *Oliver,
J., diſſen-
tiente.*

## Scollay *verſ.* Dunn.

DUNN brought a Libel in the Admiralty againſt Scollay, for that he was a Mate on board a Veſſell of Scollay's, which was taken, and ranſomed by the Maſter, and Dunn went as an Hoſtage. He was

was long Priſoner, and at laſt releaſed by the Money raiſed by ſome of his Friends, and now returned to Boſton.    Libels againſt Scollay and others, Owners of the Veſſel.    A Prohibition was granted, and the preſent Queſtion was, whether the Prohibition ſtand or a Conſultation ordered; The Point was, whether the Proceſs in the Admiralty againſt the Owners' Perſons was good. (1)

*Mr.*

1763.

SCOLLAY
*v.*
DUNN.

No Appeal lies to the King in Council from a Deciſion of this Court granting a Prohibition to the Admiralty in a Cauſe wherein the Matter in Controverſy is leſs than £300.

---

(1) The writ of prohibition is addreſſed " to Chambers Ruſſell Eſq., Judge of our Court of Vice-Admiralty, Charles Paxton Eſq., Marſhal, Andrew Belcher Eſq., Regiſter, and all the officers of ſaid Court." The libel is alleged to have ſet forth as follows : " That the libellant was mate of the brigantine Peggy belonging to John Scollay and Thomas Fletcher, and Iſaac Freeman was maſter of her, and that ſhe was taken on the high ſeas as prize by a private French ſhip of war called the *Entreprenante,* belonging to Monſieur Boutellier at Nantes, and that the ſaid Iſaac ranſomed her and her cargo for 5000 livres, to be paid in ſix months, and that the ſaid John, at the ſaid Iſaac's requeſt and direction, became hoſtage for ſecuring the payment, and was by Peter Thibaut, the French captain of ſaid ſhip, carried to Nantes," &c., " and that the libellant was finally obliged to pay the ſum of £213 10s. of his own money to obtain his liberty."    The petition further alleged that " the brigantine was not then here, and that the ſaid Court of Admiralty could not award any proceſs againſt her, and that the libellant did not allege that ſhe ever came to the petitioners' poſſeſſion, or that they ever agreed to the ſaid contract of ranſom, but that the deſign of the libellant was to make the petitioners' perſons and eſtates liable for the default of the maſter, whereof they were wholly unknowing."    After reciting the petition at length, the writ concludes as follows :

" We therefore willing to maintain the Laws and Rights of our Judi-
" catories and Courts of Record, and being unwilling our liege people
" with delays to hurt, Command and firmly Enjoin you that you meddle
" not further in the ſaid Plea or Cauſe, nor moleſt or cauſe to be moleſted
" the ſaid John Scollay and Thomas Fletcher or either of them in the
" Cauſe aforeſaid in the ſaid Court of Vice Admiralty neither attempt or
" preſume to attempt anything more therein : Untill our ſaid Juſtices have
" adviſed and conſulted therein at our Superiour Court of Judicature
" Court of Aſſize, and general Goal Delivery to be holden at Boſton,
" within and for our County of Suffolk on the third Tueſday of Feb-
" ruary inſtant, when and where you the ſaid Chambers Ruſſell and the
" ſaid John Dunn or any other perſons may be preſent, if you or they
                                                            " pleaſe

1763.

SCOLLAY
v.
DUNN.

*Mr. Auchmuty for the Juriſdiction.* The firſt be-ing taken upon the High Seas, Facts ariſing after-wards in Conſequence in the Body are within the Juriſdiction of the Court of Admiralty. Maſters may make Contracts that bind the Owners. Mol-loy, B. 2, C. 1, § 10; Ch. 2, §§ 14 & 16. Ib. B. 2, Ch. 2, § 2. Hardres, 183, *Sparks* vs. *Staf-ford.* In Salkeld the Caſe is not ſo well reported as the ſame in Mod. Rep. 'Tis unneceſſary to ſet forth Order to redeem; as the Maſter may juſtify throwing over Goods in Caſe of a Storm to ſave a greater Loſs, ſo may he redeem, as otherwiſe the Whole would be loſt. 2 Ld. Raym. 931, *Tranter* vs. *Watſon.* As for the Caſe of *Johnſon* vs. *Ship-pin* in Salkeld, that the Maſter by his Contracts cannot make the Owners liable, 6 Mod. 79 is the ſame Caſe, and not ſo reported, beſides there the Contract appeared to have been made at Land; as for the Veſſell's being loſt, 'tis of no Avail — the Owners muſt be bound inſtantly or not at all; if the Maſter has a Right to bind the Owners by his Con-tract, they are bound, and the Contract cannot be reſcinded but by the Parties, and not depend upon ſuch a Contingency as the Arrival of the Veſſell.

*Mr. Gridley.* If the Admiralty has Juriſdiction of the Principal, it has of the Incidents; if of the Thing, it has of the Perſon; as in the Caſe of Dam-age

---

" pleaſe to ſhow forth and maintain if you or they can, that the aforeſaid
" Plea or Cauſe is cognizable in the ſaid Court of Vice Admiralty.
    " Witneſs, Thomas Hutchinſon Eſq. at Boſton this twelfth day of
" February in the third Year of our Reign *Annoque Domini* 1763.
                                " NATH'L HATCH, Cler."

age done by one Ship againſt another. Molloy, B. 2, C. 2, p. 2.

*Thacher.* Whether the Owners muſt anſwer in their Perſons for the Act of the Maſter at Sea, of which they were utterly unknowing, is the Queſtion; I take it not the Owners perſonally, for the Thing itſelf is bound. Every Ranſom is a new Purchaſe, and if the Owners are liable in this Caſe, they would be liable if the Maſter had contracted with the Captors for another Ship, and ſent an Hoſtage as a Pawn.

*Ch. Juſtice.* It differs from a new Purchaſe, for a new Purchaſe from an Enemy is void; 'tis a Redemption, a Saving it from being the Enemy's Property.

*Thacher.* If the Veſſell be liable for the Ranſom, and the Maſter may retain her for the Ranſom Money, then ſhe can't remain ſo abſolutely the Owner's Property as ſhe was before the Capture. 2 Ld. Raym. 932, *Tranter* vs. *Watſon.*

*Ch. Juſtice.* The Queſtion ſeems to me to be, whether the Contract of the Maſter upon the *High Sea* is the Contract of the Owner; and whether, if it is, there is any Inſtance of Suit in the Admiralty againſt the Perſons of the Owners.

*Otis.* The very Idea of Hypothecation is that the Maſter may bind the Owners, ſo far as that Intereſt of theirs goes, with what he is intereſted. Molloy, 15, 2, Ch. 11, § 11.

It

1763.
SCOLLAY
v.
DUNN.
It is now ſettled that Owners ſhall not be liable for the Barratry of the Maſter further than the Ship and Freight.   7 G. 2.

The Power of the Maſter is confined to the Ship and Cargo.   Holt's Rep'ts, 48.   Viner, Tit. Court of Admiralty.   The Caſe of Hardres is confiſtent with the above Rule.

*Gridley.*   There are ſome Things though tranſacted upon the High Sea are not of a Maritime Nature, are not within the Juriſdiction of the Court of Admiralty.   Things of a Maritimė Nature tranſacted at Sea are undoubtedly within its Juriſdiction. So there are ſome Things of a Maritime Nature, though not tranſacted upon the High Seas, that are within the Juriſdiction of the Admiralty; ſuch are Wages of Seamen.   There is Nothing that Owners are not liable for, which is neceſſary for the Support of the Voyage; it is no Argument that becauſe the Veſſell is liable, the Owners are not alſo; Veſſell, Maſter, and Owners are all liable for Wages.   Viner, Tit. Hypoth. 329, bot.

*Otis.*   This is Nothing but Hypoth.   Viner, Tit. Mariner, 236; Tit. Maſter of a Ship, 348.

Mr. *Juſtice Oliver* delivered his Opinion in Favour of the Juriſdiction of the Admiralty.

*Juſtice Lynde.*   I take the Affair of Ranſom to be a Matter upon Sea, and therefore if the Libel was on the Ship or Cargo, I ſhould hold it good; but

but as it is not, I cannot but be for the Prohibition ſtanding.

*Chief Juſtice.* Ranſom as far as it reſpeƈts Maſter and Hoſtage maritime, ſo far as Owner and Maſter does not appear to be a Contraƈt upon the High Seas. None of the Authorities maintain the Juriſdiƈtion in this Caſe; and where it is doubtfull, I think 'tis a Rule that common Juriſdiƈtion ought to be maintained, and that the Admiralty Juriſdiction ought to be made plain and clear, which I think is not the Caſe now.

*Prohibition ſtands.* (2)

· *Mr.*

---

(2) There cannot be much doubt that the contraƈt between the owner and the hoſtage who pawns himſelf for the ranſom, is maritime, and within admiralty juriſdiƈtion. See the caſes cited above; alſo 3 Doug. 166; 1 Ld. Raym. 22. The concluſion arrived at by Mr. Juſtice Lynde is, that although the contraƈt be maritime, yet that only the remedy *in rem* can be ſought in the admiralty. The oppoſite doƈtrine may now be conſidered as eſtabliſhed in this country, "if indeed," as ſays Mr. Juſtice Sprague, (21 Law Rep. 605,) "anything as to admiralty juriſdiƈtion can now be deemed ſettled." See *Andrews* v. *Wall*, 3 How. 573, *Story*, *J.* — "Over maritime contraƈts the admiralty poſſeſſes a clear and eſtabliſhed juriſdiƈtion capable of being enforced *in perſonam* as well as *in rem.*" *New Jerſey Steam Navigation Co.* v. *Merchant's Bank*, 6 How. 392, *Nelſon*, *J.* — "If the cauſe is a maritime cauſe, ſubjeƈt to admiralty cognizance, juriſdiƈtion is complete over the perſon as well as over the ſhip; it cannot be confined to one of the remedies on the contraƈt, when the contraƈt itſelf is within its cognizance." Alſo *De Lovio* v. *Boit*, 2 Gallis. 462; Clerke's Praxis, Tit. 1. But that it was once ſo confined to one remedy in ſome caſes by the Engliſh law, ſee the diſſenting opinion of Mr. Juſtice Johnſon in *Allegre* v. *Ramſay*, 12 Wheat. 614. The reſolutions of 1632 gave the admiralty juriſdiƈtion *in rem*, but not *in perſonam*, over contraƈts for "building or mending, ſaving or neceſſary viƈtualling of a ship." And Mr. Juſtice Johnſon, *ub. ſup.*, contends that the only inſtance of admiralty juriſdiƈtion *in perſonam* upon contraƈts was for ſeamen's wages, which was allowed on the principle of *communis*
*error*

1763.

SCOLLAY
*v.*
DUNN.

*Mr. Gridley* then claimed an Appeal to the King and Council : Reaſon of Government requires that they ſhould have Power of final Judgment in Caſes of Importance; at Home, in Caſe of *Ejeƈtione Firmæ* on a Leaſe, Appeal lies.

*Auchmuty.* This is a Matter that deſerves Appeal. Vaughan Rep. 290, 402. That Writs of Error lie in all inferiour Dominions, Ib. 418. Admiralty Juriſdiƈtion is expreſſly excepted from our Charter; (3) and if no Appeal lies in this Caſe, it ſeems to me that Exception is of no Value. 1 Peere Wms. 330, *Chriſtian* vs. *Corren.*

*Mr. Thacher.* The laſt Clauſe of the Charter relative to this Matter of Appeals ſeems evidently explanatory

---

*error facit jus.* But ſee 3 Burr. 1740, where Dunning, *arguendo,* " admitted that aƈtions had been brought in the admiralty by the hoſtage againſt the owners who refuſed to ranſom him." Alſo 5 Rob. 104, where it is ſtated that in ſuits for ranſom on the part of the enemy, " proceedings were always carried on againſt the owner in the name of the hoſtage ſuing for his liberty." Whether the claim of the hoſtage againſt the owners is in the nature of ſalvage, and therefore dependent on the ſafe arrival of the veſſel, or whether, as argued here, the owners are bound inſtantly by the aƈt of redeeming her from her preſent peril — *quære.* A recapture of a ſhip from the enemy or from pirates is ſalvage. *The Trelawney,* 4 Rob. 227. And where the poſſeſſion has been parted with for the benefit of the owner, proceedings *in perſonam* may be ſuſtained. *The Hope,* 3 Rob. 216.

(3) " Provided always, and it is hereby declared, that nothing herein ſhall extend or be taken to ereƈt or grant or allow the exerciſe of any admiral court, juriſdiƈtion, power or authority, but that the ſame ſhall be, and is hereby reſerved to us and our ſucceſſors, and ſhall from time to time be ereƈted, granted and exerciſed, by virtue of commiſſions to be iſſued under the Great Seal of England, or under the ſeal of the high admiral, or the commiſſioners for executing the office of high admiral of England." *Province Charter,* Anc. Chart. 36.

explanatory of the firft, (4) the Matter in Difference only is what is to be confidered in giving Jurifdiction, and not the Suggeftion of Damages.

*Otis.* It appears to me that by the plain Conftruction of the Words of the Charter, the Matter in Difference muft neceffarily be £300. Courts have conftantly denied Appeals where there has has been no Judgment for more than that Sum; this has been the contemporaneous Expofition of it.

*Gridley.* The Charter fhould be liberally conftrued in Favour of Appeals. I hold, this Court, by the Claufes in our Charter relative to this Matter, is to judge of the Limitations of Appeals. " In all Matters deferving the fame," are the Words upon which my Opinion is founded. It feems to be fettled that the Subject has a Right in all Caufes to appeal; therefore even the King cannot abridge it. " All Matters deferving the fame " ought to have a liberal Conftruction in Favour of the Subject. " We think it neceffary that our Subjects fhould have Liberty of Appeal to us in all Cafes that may deferve the fame." The Conftruction, the Gentlemen on the other Side would give, feems to be providing Appeals only for the Defendant; upon their

Principles,

---

(4) " And whereas we judge it neceffary that all our fubjects fhould have liberty to appeal to us, our heirs and fucceffors, in cafes that may deferve the fame, we do by thefe prefents ordain, that in cafe either party fhall not reft fatisfied with the judgment or fentence of any judicatories or courts within our faid province or territory, in any perfonal action, wherein the matter in difference doth exceed the value of three hundred pounds fterling, that then he or they may appeal to us, our heirs and fucceffors, in our or their privy council." *Province Charter*, Anc. Chart. 32.

II

1763.

SCOLLAY
*v.*
DUNN.

Principles, a Demurrer being to the Declaration, and Judgment againſt the Plaintiff, how. can. he ever appeal ?

*Juſtice Oliver.*    I take the firſt Clauſe in the Charter relating to Appeals to be only introductory to the ſecond, and that there can be no Appeal where the Matter in Difference is leſs than £300 ; and upon that ſecond Clauſe I am againſt granting an Appeal in this Caſe.

NO

*Juſtice Cuſhing.*    I take, the ſecond Clauſe is explanatory, and ſo I am againſt it.

NO

*Juſtice Lynde.*    With Regard to the firſt Clauſe, it appears to me to be only introductory, and therefore on that I am of the ſame Opinion ; as to the ſecond I am doubtfull, but as I am in general againſt Appeals, I am againſt it in this Caſe.

No

*Chief Juſtice.*    Firſt, whether the Subject Matter comes within the Clauſe of the Charter relative to Appeals, as it is an Affair begun in the Admiralty and brought here only by Prohibition ; and for this we muſt look into the Charter, which entirely reſerves and excepts it, and 'tis by a ſubſequent Act we have any Right to iſſue Prohibitions to it ; (5) and

---

(5) The Province Law of 11 W. 3, which gave the Superior Court general juriſdiction " as fully and amply to all intents and purpoſes whatſoever as the Courts of King's Bench, Common Pleas and Exchequer within his Majeſty's Kingdom of England, have or ought to have." Anc. Chart. 331. " The rights of the courts of common law within the Province of the Maſſachuſetts to reſtrain the exceſſes of the Admiralty Juriſdiction, are not derived from their charter, but from ſubſequent

and if we have any Right to judge, I think it is the ſame as if the Matter came originally before this Court. Under the old Colony Charter, there was no Mention of Appeals; this was Objection againſt that Charter. One while in the Quo Warranto, that Clauſe in the new Charter was looked upon as a great Priviledge; (6) had it ſtood without any Clauſe, all Cauſes would have been appealable: I take it therefore to be a Priviledge in our Charter; " all Cauſes which deſerve it," is explained to be above £300, but ſhould it be admitted to be within the Diſcretion of the Court to grant Appeals, whether leſs or more, I ſhould be againſt it, in Favour of Priviledge. As for this Caſe, whether it exceeds £300 or no, there is the Difficulty. I am conſidering the Allegations, &c., in Favour of Appeal. (7)

1763.

SCOLLAY
v.
DUNN.

---

ſubſequent laws of the Province, confirmed afterwards by the Crown." Dummer's Defence of the New England Charters, (Boſton ed. 1745,) 26.

(6) Under the Colony Charter no appeals to England were allowed. See the remonſtrance of the legiſlature to the Long Parliament — " We have not admitted appeals to your authority, being aſſured they cannot ſtand with the liberty and power granted us by our charter." 1 Bancroft's Hiſt. U. S. 441. Afterwards in the reign of Charles 2, the colony " joined iſſue with the King by denying the right of appeal." 2 Ib. 74. And this was one of the principal cauſes of the ſubſequent iſſuing of the Quo Warranto, by which the charter fell.

(7) The appeal was not granted. On a ſubſequent page in the MS. is the following memorandum: " Dunn v. Scollay, Caſe of Hoſtage & Ranſom: Authorities in Favour of the Plaintiff were Molloy, (Old Edit.) 205 § 10, 212 § 14, 213 § 14. Molloy, (New Edit. 1744,) 358, 237, 8; 244, 5. 2 L'd Raymond, 931; Lord Holt's Opinion relied on; Sea Laws, 128. In Favour of the Defendant were 2 Chancery Caſes, 239; 1 Salk. '35; 3 Bacon, 592, 595.